UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TALMIKA BATES, | Case No. 22-cv-01097-RFL |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| RYAN REZENTES, | |
| Defendant. | Re: Dkt. No. 46 |

This case arises from the use of a police dog to continue biting an unarmed suspect hiding in the bushes after she had verbally expressed her intent to come out.  In February 2020, Defendant Brentwood Police Officer Ryan Rezentes used his police dog to find and bite Plaintiff Talmika Bates, who fled after stealing merchandise from an Ulta Beauty store.  Rezentes's dog located Bates in a bush and bit into the top of her head.  Seconds later, Bates shouted, "Please get your dog, I'm coming out!"  After Bates's cry, the dog continued to hold its bite and pull back Bates's scalp for another forty seconds, while she continued to scream and plead. Approximately one minute after the dog initially found and bit Bates, Rezentes manually released the dog from Bates's head.  The photographs from the incident show significant portions of Bates's scalp ripped from her head at the site of the bite, and she has been diagnosed with ongoing traumatic brain injury.

Rezentes moves for summary judgment on Bates's claim of excessive force in violation of 42 U.S.C. § 1983, arguing that:  (1) Bates's claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (2011), (2) the evidence is undisputed that Rezentes did not use excessive force, and (3) Rezentes is entitled to qualified immunity.  Because Bates appears to have abandoned any claim that the initial dog bite constituted excessive force, summary judgment is **GRANTED** as

to that portion of her claim.  However, Bates raises genuine issues of material fact regarding whether Rezentes used excessive force when he allowed the dog to continue to bite her even after her verbal surrender, and that claim is not barred by the *Heck* doctrine or qualified immunity.  Rezentes's Motion for Summary Judgment is therefore **DENIED** as to Bates's claim concerning the duration of the bite.

## I.     FACTUAL BACKGROUND

### A.     Theft and Initial Pursuit

On February 10, 2020, Plaintiff Talmika Bates, along with her companions, Ramiah Armstrong and Keilaysha Usher, stole perfume and other merchandise from an Ulta Beauty store.  (Dkt. Nos. 46-2 Ex. B and 48-1 ("Bates Depo.") at 80:4–82:7.)  Around 11:40 a.m., the women left the store with the stolen merchandise and got into Usher's car, a white Nissan Murano.  (*Id*.; Dkt. No. 46-2 Ex. C-2 ("Ulta Video").)

Ten minutes later, Brentwood Police Department ("BPD") officers were dispatched to Ulta for a reported grand theft of over $10,000 in merchandise.  (Dkt. No. 48-2 ("CAD") at 11:50:25.)  Officer Matthew Head spotted the Murano at an intersection and pulled his car near the Murano's front bumper to block it from turning.  (Dkt. Nos. 46-2 Ex. D and 48-4 ("Head Depo.") at 19:9–20:8, 34:13–22; Dkt. Nos. 46-2 Ex. E and 48-3 ("Car Cam") at 0:47–1:00.)  The Murano drove off, colliding with Ofc. Head's car as it pulled away.  (Car Cam at 0:53–57; Bates Depo. at 83:9–22; Head Depo. at 37:7–10.)  At 12:03 p.m., Ofc. Head called this collision in to dispatch as a "245," an assault on an officer with a deadly weapon.  (Head Depo. at 36:9–19; CAD at 12:03:56.)  About twenty-five minutes later, Sergeant Chris Peart negated the "245" and told dispatch that Ofc. Head had experienced a collision with a vehicle, not an assault with a deadly weapon.  (CAD at 12:27:52; Head Depo. at 43:9–19.)

Usher drove the car to a nearby field, where the women got out and fled on foot.  (Bates Depo. at 88:23–89:24; *see also* Car Cam at 4:26.)  Bates and Armstrong both fled into the field and hid among a patch of shrubbery.  (Bates Depo. at 89:25–94:22.)

### B.   Rezentes's Canine

Defendant Officer Rezentes is a police officer and canine handler.  At the time of the incident, Rezentes was responsible for handling a police dog named Marco, an 85-pound German Shepherd.  (Dkt. Nos. 46-2 Ex. G. and 48-6 ("Rezentes Depo.")[1] at 41:8–42:6.)  Prior to the incident, Rezentes had worked as Marco's canine handler for six years, during which time he received annual Peace Officer Standard and Training ("POST") certifications.  (Dkt. No. 46-2 Ex. M ("Rezentes Decl.") ¶ 4.)  From 2019 through 2021, Rezentes deployed Marco thirty-seven times and made four bite apprehensions.  (*Id.* ¶ 11.)

Marco is trained on certain commands, including "revere," meaning "search"; "drz," meaning "bite"; and "pust," meaning "release."  (Rezentes Depo. at 45:6–46:16.)  While Marco is trained to perform a "verbal out," meaning an immediate release upon Rezentes's command, Rezentes does not do verbal outs in real-life deployments.  (*Id.* at 66:17–67:12.)  Instead, he removes Marco manually.  (*Id.* at 67:10–22, 102:14–22.)  When making a bite apprehension, Marco is trained to bite and hold the first body part he touches.  (*Id.* at 68:15–21.)  But he is not trained to bite heads or necks.  (*Id.* at 68:15–69:20.)

### C.   Rezentes's Search

Although Rezentes and Marco were off-duty at the time of the theft, Sgt. Peart asked if they could come join the search.  (*Id.* at 78:2–21; Dkt. Nos. 46-2 Ex. I and 48-7 ("PMK Depo.") at 12:3–18.)  Sgt. Peart told Rezentes that three women had stolen over $10,000 worth of merchandise from Ulta, "rammed" a patrol car, and fled into an area BPD had since secured.  (Rezentes Depo. at 78:5–10.)  Rezentes was not told that any of the suspects were armed.  (*Id.* at 86:22–87:4.)  During his drive to the field, Rezentes had access to the computer aided dispatch ("CAD") system in his car, which would have allowed him to see both the "245" alert (indicating an assault on an officer with a deadly weapon) and Sgt. Peart's retraction of that designation.  (*Id.* at 79:12–19.)  Rezentes does not recall if he reviewed the information in the CAD prior to

---

[1] The parties submitted copies of Rezentes's deposition that use differing line numbers. As Bates submitted more pages of the deposition, cites are to the version she provided in Docket Number 48-6 where available.

arrival on scene.  (*Id.*)  Rezentes arrived at the field sometime between 12:40 and 12:50 p.m.  (*Id.* at 81:7–9, 82:21–84:6; CAD at 12:40:12, 12:50:05.)

By the time Rezentes joined the search party, Usher had been detained, and Bates and Armstrong remained hidden.  (Rezentes Depo. at 80:12–16, 87:10–14.)  Bates, who was unarmed, admits that she knew that police were searching for her while she hid in the bush.  (Bates Depo. at 108:17–21.)  Without giving a canine warning to allow the women an opportunity to surrender, Rezentes commanded his police canine, who he maintained on a six-foot leash, to search a thicketed patch at the border of the field.  (Rezentes Depo. at 90:13–22, 92:15–19, 126:13–127:1.)   Officer Justin Luo, an experienced canine cover officer, provided lethal cover.  (*Id.* at 93:25–94:9; Dkt. No. 48-9 ("Luo Depo.") at 17:18–22, 25:24–26:6.)  As Rezentes and Ofc. Luo walked along the thicketed patch, Marco turned left and stepped into the bushes.  (Rezentes Depo. at 95:11–19, 128:20–24.)  Rezentes heard someone shout, "Get the dog off," and believed that Marco had bitten one of the women.  (*Id.* at 96:12–98:3.)  Rezentes had not given Marco the command to bite prior to that point.  (*Id.* at 92:15–19, 95:16–96:11, 128:20–24.)

Bates testified at deposition that, at the time of the dog bite, she was crouched down and on the phone with her mom.  (Bates Depo. at 132:1–7, 134:18–20.)  The canine came from behind and bit onto the back of Bates's head, pulling and dragging her backwards onto the ground.  (*Id.* at 132:3–133:14.)

**D.    The Bite**

The remainder of the encounter was captured on Ofc. Luo's bodyworn camera ("bodycam").  When the footage begins, Rezentes is bent over holding the outstretched leash, Marco's tail can be seen sticking out of the bush, Ofc. Luo is standing nearby shouting, "Crossfire, Chief, crossfire," and another officer is seen further down screen walking towards the bush with his gun drawn.  (Dkt. Nos. 46-2 Ex. M and 48-10 ("BWC") at 0:00–0:03.)  Multiple people are heard screaming in the first ten seconds:  a woman shouts, "I'm right here," a man says, "Hands up," Rezentes shouts, "Crawl towards me.  Marco pust [i.e., 'release']," and Bates

shouts, "He's biting me!"  (*Id.* at 0:00–0:10.)  Ofc. Luo then raises his gun towards the bush and Rezentes shouts, "You gotta crawl out to me."  (*Id.* at 0:09–0:14.)

At the sixteen-second mark, Bates shouts, "Oh my god, please get your dog, I'm coming out.  I'm coming out, please get your dog!" (*Id.* at 0:15–0:17.)  Rezentes tells Bates, "You have to crawl out to me," and Bates cries, "But your dog's biting me!"  (*Id.* at 0:17–0:25.)  With his gun trained towards Bates, Ofc. Luo tells Rezentes, "Don't worry, I won't shoot your dog."  (*Id.* at 0:25–0:29.)  In the background, another woman can be seen standing against the fence with her arms raised.  (*Id.* at 0:23.)

Thirty seconds into the video, Rezentes and Ofc. Luo enter the bush.  (*Id.* at 0:29–0:33.)  Rezentes crouches inside the bush immediately next to Bates, who appears to be lying on the ground.  Bates cries and screams, saying "My whole brain!"  (*Id.* at 0:33–35.)  She repeatedly calls out for her "mama," and over the following thirty seconds, shouts:  "Mama, the dog," "my whole brain, mama," and "my whole brain is bleeding."  (*Id.* at 0:33–1:06).

Fifteen seconds after the officers enter the bush, Bates remains in the same position lying on the ground, screaming and crying.  The dog is only partially visible but is positioned by her head.  She cries, "Can you get the dog?"  Rezentes does not respond to her question and instead commands back, "Get off the phone," and, "Sit up right now."  (*Id.* at 0:44–0:52.)

Fifty-six seconds into the footage, Rezentes says, "Marco pust," and, five seconds later, he says, "Pust," again.  (*Id.* at 0:55–1:00.)  Just after the one-minute mark, Rezentes appears to manually remove the dog.  (*Id.* at 1:00–1:03.)  Three minutes after the footage begins, Bates exits the bush, revealing a large, open wound at the top of her skull.  (*Id.* at 3:00–3:15.)

### E.   Bates's Injuries

Significant portions of Bates's scalp were torn off, exposing her skull.  (Dkt. No. 48-11 ("Injury Photos").)  Blood and tissue are visible through the open wound.  (*Id.*; *see also* BWC at 3:00–3:15.)  On scene, Bates received emergency medical care before being transported to the hospital by ambulance.  (*Id.* at 1:12–16:16; Bates Depo. at 170:1–7.)  Testing at the hospital revealed clear soft tissue damage and no skull fracture.  (Dkt. No. 48-12 ("Angelone Rpt.") at 3.)

Bates underwent surgical tissue rearrangement and laceration repair, and was discharged later that day.  (*Id.*; Bates Depo. at 170:5–16.)

Since then, Bates has experienced intense and frequent headaches near the wound site, which have improved somewhat over time.  (Angelone Rpt. at 3.)  She also reports dizziness, vertigo, ringing in her ears, and sensitivity to light.  (*Id.*)  Cognitively, she reports issues with short-term memory, attention, concentration, multitasking, information processing, and stuttering.  (*Id.* at 3–4.)  Both Bates and her mother have noticed emotional effects as well: Bates feels depressed about her appearance after the attack, and her sleep is interrupted by nightmares about dog attacks.  (*Id.* at 4.)  Her personality has changed, and she now cries more easily, laughs inappropriately, and experiences increased irritability, mistrust, lack of motivation, and apathy.  (*Id.*)  Neuropsychological testing revealed signs of impairment.  (*Id.*)  Based on these signs and symptoms, Bates has been diagnosed with a mild diffuse traumatic brain injury, mild post-traumatic brain syndrome, and post-traumatic stress disorder.  (*Id.* at 3.)

### F.    Penal Code § 148(a)(1) Conviction

On January 14, 2022, Bates pleaded no contest to resisting arrest in violation of California Penal Code § 148(a)(1) and no contest to misdemeanor grand theft in violation of Penal Code § 487(a).  (Dkt. No. 46-2 Ex. K ("Plea Transcript") at 10:3–27.)  During the hearing, the Court had the following interaction with Bates's counsel:

> THE COURT: I find the defendant has freely, voluntarily, knowingly, and intelligently waived her rights to a jury trial, and pled no contest to Count 3 [Section 148(a)(1)] and amended Count 4 [Section 487(a)].  I find there's a factual basis — Counsel stipulate to a factual basis for the plea?
>
> [BATES'S COUNSEL]: Yes, based upon review of the police reports.
>
> THE COURT: Okay.  I find there's a factual basis for the plea, and based on the plea I find the defendant guilty as charged in the Count 3 and Count 4.

(*Id.* at 10:28–11:9.)  The police reports include Rezentes's account of the search and dog bite. (Dkt. No. 46-2 Ex. L ("Police Rpts.").)

At deposition, Bates was asked, "So you would agree you were resisting, obstructing, or delaying the police officers up until the point in time when you were found by the dog hiding in the bushes, and that was the purpose of this Count 3 conviction or plea, true?"  Bates's counsel objected as compound and calling for legal conclusion, and then Bates responded, "Yes."  (Bates Depo. at 159:20–160:6.)

> ### G.     Trainings and Policies

Typically, canine officers are trained that the dog should bite and hold, and that the officer should call the person to come towards them.  (PMK Depo. at 21:1–12.)  Officers are not trained to have their canines attack or attach to the neck, head, or groin; but the dogs are trained to bite the first body part they contact.  (PMK Depo. at 23:24–24:4; Rezentes Depo. at 68:15–69:20.)  If a dog does latch onto a person's head, neck, or groin, officers are trained to intervene as soon as reasonable, typically within "a few seconds, you know, depending on the circumstances."  (PMK Depo. at 24:12–25:7.)

## II.     EVIDENTIARY OBJECTIONS

On Reply, Rezentes objects to several attachments to the Buelna Declaration (Dkt. No. 48-14) on evidentiary grounds:  Exhibit 8, a still frame from the bodycam footage (Dkt. No. 48-8); Exhibit 12, Dr. Edgar Angelone's Rule 26 report on Bates's medical conditions (Dkt. No. 48-12); and Exhibit 13, Erwin Burwell's Rule 26 report on canine police practices (Dkt. No. 48-13).  (*See* Dkt. No. 52 at 15.)  "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56."  *Block v. City of Los Angeles*, 253 F. 3d 410, 418–19 (9th Cir. 2001).

This opinion does not rely on the still frame or Mr. Burwell's report, so the objections to those are overruled as moot.  Rezentes broadly objects, without further explanation, to the entirety of Dr. Angelone's expert report as speculative, irrelevant, prejudicial, and improper expert opinion.  (Dkt. No. 52 at 15.)  Dr. Angelone, a clinical neuropsychologist, describes his interview of Bates, Bates's neuropsychological examination, and his review of her brain MRI

and medical records, and provides his diagnosis and treatment recommendations.  (Dkt. No. 48-12.)  The report is relevant to the level of injuries Bates suffered, which pertains to whether she was able to crawl out of the bushes with the dog still biting her head and whether she had done everything in her power to communicate her surrender when she said she would come out.  The severity of Bates's injuries is also relevant to whether Rezentes would likely have been able to perceive her level of distress from his vantage point peering into the bushes or crouched next to her with his head near the ground.  The report does not appear unfairly prejudicial or speculative in its approach, and Rezentes identifies no reason why it would be.  Nor does there appear to be anything improper about the topics on which Dr. Angelone opined.  The objections to Dr. Angelone's report are therefore overruled.

## III.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which could affect the outcome of the case under the substantive law, and a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that there is no genuine issue of material fact.  *Id.* at 256.  When the movant has carried its burden, the nonmoving party may defeat summary judgment by showing that a material factual dispute exists.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Courts must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."  *Id.* at 378 (cleaned up).  When there is bodycam footage of the incident in question, courts must "view the facts in the light depicted by bodycam footage and its accompanying audio, to the extent the footage and audio *blatantly* contradict testimonial evidence."  *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (emphasis in original).

Summary judgment "should be granted sparingly" in excessive force cases "[b]ecause the reasonableness standard nearly always requires a jury to sift through disputed factual

contentions, and to draw inferences therefrom[.]" *Torres v. City of Madera*, 648 F.3d 1119, 1125 (9th Cir. 2011). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc), *disapproved of on other grounds by Lemos v. Cnty. Of Sonoma,* 40 F.4th 1002 (9th Cir. 2022).

## IV.   DISCUSSION

### A.   Alleged Acts of Force

In February 2022, Bates filed suit for violation of 42 U.S.C. § 1983, alleging excessive force by Officer Rezentes in violation of the Fourth Amendment. The allegations of the Complaint encompass the initial release of the dog without warning, the bite itself, and the ongoing nature of the dog bite, which continued after Bates stated that she would come out of the bush. (Dkt. No. 1 ¶¶ 2–5.) However, Bates concedes in her Opposition to Rezentes' Motion for Summary Judgment that the "initial deployment of the dog may be justified on Plaintiff's refusal to reveal herself from a concealed location." (Dkt. No. 48 at 28.) She has made no attempt to carry her burden on this point and has failed to show any genuine disputes of material fact as to the reasonableness of the initial canine deployment.

Instead, Bates's Opposition and argument at the hearing focused on the duration of the bite, which continued after she indicated her verbal surrender. (*Id.* at 16.) Accordingly, Rezentes's Motion for Summary Judgment is granted as to the initial deployment, and the remainder of this Order assesses whether the duration of the dog bite, not the initial deployment, constitutes excessive force.

### B.   *Heck* Preclusion

Bates's excessive force claim is not barred by *Heck v. Humphrey*, 512 U.S. 477 (2011), because her requested relief does not necessarily imply the invalidity of her criminal conviction. Under *Heck*, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of [her] conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. To prevail on a *Heck* argument, the defendant must make "clear from

the record" that the plaintiff's successful prosecution of their claim "would *necessarily* imply or demonstrate that the plaintiff's earlier conviction was invalid." *Smith*, 394 F.3d at 699 (emphasis in original).

At issue is Bates's plea to Cal. Pen. Code § 148(a)(1) for resisting, delaying, or obstructing a peace officer.  Section 148(a)(1) requires that the officer must have been "engaged in the performance of his or her duties" when the criminal defendant resisted, delayed, or obstructed the officer.  *Yount v. City of Sacramento*, 43 Cal. 4th 885, 895 (2008).  Since "[t]he use of excessive force by an officer is not within the performance of the officer's duty," an excessive force claim is barred if it is "predicated on allegedly unlawful actions by the officer *at the same time* as the plaintiff's conduct that resulted in [her] § 148(a)(1) conviction."  *Sanders v. City of Pittsburg*, 14 F.4th 968, 971 (9th Cir. 2021) (emphasis in original).  But "if the alleged excessive force occurred before or after the acts that form the basis of the § 148(a) violation, even if part of one continuous transaction, the § 1983 claim doesn't necessarily imply the invalidity of a criminal conviction under § 148(a)(1)."  *Id.* (cleaned up).

Analogizing to *Sanders*, another excessive force case involving a dog bite, Rezentes argues that Bates's claim is *Heck*-barred.  In *Sanders*, the plaintiff pleaded no contest to a resisting arrest charge and stipulated that the factual basis for his plea was "based on the preliminary hearing transcript," in which the arresting officer testified that Sanders "hindered efforts to arrest him by 'first fleeing in the vehicle, then fleeing on foot, and then resisting officers attempting to arrest him.'" *Id.* at 970.  At the preliminary hearing, the canine officer testified that he ordered his dog to bite Sanders's leg "as he observed other officers struggling to apprehend Sanders's arms[.]" *Id.* at 972.  Because the dog bite could not be separated from Sanders's resistance to the officers attempting to arrest him, and because Sanders "stipulated that the factual basis for his conviction encompassed the three instances of resistance," the Ninth Circuit found his excessive force claim was barred. *Id.*  Rezentes argues that, as in *Sanders*, the entire "dog bite in this case is unquestionably part of the actions that formed the basis of [the plaintiff's] conviction," *id.*, because Bates stipulated to the police reports as the factual basis for

her plea, and the reports detail the entire interaction through the full duration of the dog bite.  But that is not what the record shows.

Bates did not stipulate to the police reports as the factual basis for her plea.  At Bates's plea hearing, the court asked whether her counsel "[s]tipulate[d] to a factual basis for the plea," to which her counsel responded, "Yes, based upon ***review of*** the police reports."  (Plea Transcript at 10:28–11:9) (emphasis added).)  Under California law, a misdemeanor does not require the court to know what the factual basis is for the plea, or to make an independent assessment of its adequacy.  *See In re Gross*, 189 Cal. Rptr. 848, 852 (1983) ("Before a court may approve a plea of guilty or nolo contendere to a felony, it must satisfy itself that there is a factual basis for the plea. . . . However, there is no similar requirement — statutory or constitutional — for the approval of such a plea to a misdemeanor.").  With that context, it is reasonable to interpret the court's question as asking whether a factual basis exists, not which specific facts constitute the factual basis.  And, it is likewise reasonable to interpret Bates's counsel's response as stating that they had reviewed the police reports and confirmed that a factual basis exists, without necessarily stipulating to every fact in those reports.  Indeed, if Bates's counsel had intended to stipulate that the entire contents of the police reports were true, they would have said, for example, "Yes, we stipulate to the police reports," or, like in *Sanders*, "Yes, based on the police reports."  *Cf. Sanders*, 14 F.4th at 970.  Nor did the court adopt any particular factual basis in accepting Bates's plea, stating only "I find there's a factual basis for the plea" without stating what the basis was.  (Plea Transcript at 11:10–11.)  On the current record, Rezentes has not carried his burden to establish a "clear record" that Bates's plea constituted a stipulation to the entirety of the police reports.

Bates's deposition testimony does not alter this analysis.  Bates was asked, "So you would agree you were resisting, obstructing, or delaying the police officers up until the point in time when you were found by the dog hiding in the bushes, and that was the purpose of this Count 3 conviction or plea, true?"  (Bates Depo. at 159:20–160:6.)  Bates's counsel properly objected to that question as compound, as it is impossible to tell whether Bates is answering

"Yes" to the first question or the second.  It is also not clear if (1) she was being asked only about her own conduct in resisting, obstructing, or delaying; or (2) she was being asked whether the legal elements of Penal Code Section 148(a), including the lawfulness of the officers' conduct, were met during the time period prior to the dog bite.  The former question would not bear on the *Heck* issue, and the latter question would call for a legal conclusion from a nonlawyer, as her counsel properly objected.  More fundamentally, even if Bates's answer were admissible, it does not establish that Bates conceded the legality of the *duration* of the dog bite, because the question only asked her about the period "up until when you were found by the dog." (*Id.*)  Bates's excessive force claim, as noted above, is based on the assertion that the dog continued biting her after she indicated verbal surrender.

Moreover, even if Bates had stipulated to the police reports as the factual basis for her plea, Rezentes has still not shown that Bates's excessive force claim about the duration of the dog bite necessarily implies the invalidity of her Section 148(a) conviction.  Unlike the preliminary hearing testimony in *Sanders*, the police reports do not clearly identify which of Bates's acts formed the basis of her Section 148(a) charge or, more specifically, whether her charge was based on Bates's acts after she said she was "coming out."  (Police Rpts.)  Indeed, the summary section of the police report detailing the three women's arrests states that they had "delayed" the officers "by willfully hiding with no attempts to surrender."  (*Id.* at 18.)  That implies that Bates's Section 148(a) charge was based on acts *prior to* her attempt to verbally surrender, whereas her excessive force claim challenges Rezentes' decision to allow the dog to continue to bite her *after* she said she was coming out.

In *Hooper v. Cnty. of San Diego*, 629 F.3d 1127 (9th Cir. 2011), the Ninth Circuit held that *Heck* does not bar recovery where a Section 148(a)(1) conviction and excessive force claim "are based on different actions during one continuous transaction."  *Id.* at 1134 (cleaned up).  There, Hooper pulled her hand away when the officer told her she was under arrest.  *Id.*  A struggle ensued, and the officer eventually subdued Hooper, and held her on the ground with her hands behind her back.  *Id.*  At some point, the officer called for his police dog, who proceeded

to bite Hooper's head.  *Id.*  The dog lost its bite, and then bit again and held her head, tearing her scalp.  *Id.*  About forty-five seconds after the officer first tried to arrest Hooper, his backup arrived, and the dog then released its bite.  *Id.*  Although Hooper's arrest and the allegedly excessive force occurred "in a single continuous chain of events lasting a very brief time," the Ninth Circuit found that "[a] holding in Hooper's § 1983 case that the use of the dog was excessive force would not negate the lawfulness of the initial arrest attempt or negate the unlawfulness of Hooper's attempt to resist it[.]"  *Id.* at 1131, 1133 (cleaned up).  Affirming that *Hooper* remains good law, the *Sanders* court explained that "Hooper's § 1983 action could separately target one action — the allegedly unlawful dog bite — without disturbing the § 148(a)(1) conviction.  Accordingly, . . . *Heck* presents no bar to an excessive force claim when an officer's allegedly unlawful action can be separated from the lawful actions that formed the basis of the § 148(a)(1) conviction, even if they occurred during one continuous transaction."  *Sanders*, 14 F.4th at 972.

Here, Rezentes's allegedly unlawful action can be separated from the lawful actions that formed the basis of the Section 148(a)(1) conviction.  While the initial pursuit, including the initial deployment of the canine, may be subject to the *Heck* bar, the duration of the bite after Bates indicated her verbal surrender is not barred.  It is undisputed that there were a variety of accusations against Bates that could have formed the basis for her conviction — from fleeing by car, to running into the field, to hiding in the bush.  It is also undisputed that the officers acted lawfully in their initial pursuit.  Because any one of those incidents could form the basis for her plea, her claim is not *Heck*-barred.

### C.    Excessive Force

Viewing the facts in Bates's favor, a reasonable jury could conclude that Rezentes violated the Fourth Amendment by allowing his dog to hold its bite on Bates's head for forty seconds after she indicated her surrender.

In excessive force cases, law enforcement officers violate the Fourth Amendment where, "given the totality of the circumstances," their actions prove objectively unreasonable.  *Nehad v.*

*Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019).  Reasonableness is assessed by weighing:

"(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (cleaned up).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  If the evidence, viewed in light most favorable to the plaintiff, could support a finding of excessive force, the Court cannot grant the defendant's motion for summary judgment. *Smith*, 394 F.3d at 701.

### 1.     Severity of Intrusion

A reasonable jury could conclude that the government's intrusion was severe.  Ninth Circuit "precedent establishes that characterizing the quantum of force with regard to the use of a police dog depends on the specific factual circumstances." *Lowry*, 858 F.3d at 1256.  For instance, in *Smith*, the government intrusion was "severe" where officers pepper-sprayed the plaintiff multiple times and then deployed the police dog three times, at least one of which was after officers had pinned the plaintiff on the ground.  394 F.3d at 701–02.  In *Miller v. Clark Cnty.*, 340 F.3d 959, 961–64 (9th Cir. 2003), the intrusion was "serious" where officers deployed a dog for 45–60 seconds and the dog shredded the plaintiff's arm muscles.  Use of the bite-and-hold technique constitutes, at the very least, a significant degree of force.  *See id.* at 964.

Here, the bodycam footage shows:  (1) the police dog bit and latched onto the top of Bates's head, near her scalp; (2) seconds later, Bates shouted, "Please get your dog, I'm coming out"; (3) Rezentes ordered Bates to crawl out of the bush, to which she cried, "But your dog's biting me"; (4) Rezentes allowed his dog to continue biting Bates for another forty seconds while she cried and screamed "Mama please help me," and "My brain"; and (6) approximately one minute after the bite began, Rezentes physically removed the dog from Bates's head.  (*See generally* BWC.)  It is undisputed that Bates sustained a large, open head wound that required

surgery, and that she was released from the hospital the same day.  (Bates Depo. at 170:5–16.)
Uncontradicted medical evidence shows that Bates continues to suffer brain damage, cognitive
impairment, and headaches.  (Angelone Rpt. at 3–5.)

Both the duration and the location of the dog bite exacerbate the seriousness of the
intrusion Bates endured.  The Ninth Circuit has found that "ordering a police dog to bite a
suspect's arm or leg *and permitting the dog to continue biting for up to one minute*, an unusually
long bite duration," constitutes a serious intrusion.  *Miller*, 340 F.3d at 962, 964 (emphasis in
original).  Here, the dog held its bite for approximately one minute, forty seconds of which were
after Bates said that she was coming out of the bush.  (BWC at 0:00–1:03.)  On that alone, a
reasonable jury could find the intrusion severe.

But the location of the dog's bite — Bates's head — is also important.  The head is a
uniquely vulnerable part of the body.  Brentwood police officers are trained that a dog bite to the
head "could cause serious bodily harm" or even "kill someone," and that officers are expected to
intervene "as soon as it's reasonable," which would be within "a few seconds, you know,
depending on the circumstances."  (PMK Depo. at 24:12–25:7.)  When a reasonable officer
would have become aware that the dog was biting Bates's head is a question of fact for the jury.
The bodycam video shows Rezentes crouching immediately next to Bates with Rezentes' head
close to the ground about thirty seconds after the bite began.  (BWC at 0:33–35.)  At that time,
Bates is screaming, "My whole brain!"  (*Id.*)  She continues to repeat cries about her "brain."
(*Id.* at 0:33–1:06).  Her distress is clear from the shouts recorded in the bodycam footage; given
the severity of Bates's wounds, a reasonable jury could infer that the immediacy of the situation
would have been even more apparent to an officer kneeling close to her head.  Drawing
inferences in Bates's favor, a reasonable officer in Rezentes's position would have known by
that point that the dog was biting Bates's head.  However, Rezentes did not immediately instruct
the dog to release its bite or remove the dog within a few seconds.  Instead, Rezentes
commanded Bates to "[g]et off the phone" and "[s]it up right now," while the dog continued to
bite her head.  (*Id.* at 0:44–0:52.)  A reasonable jury could infer that Rezentes became aware that

the dog was biting Bates's head at about thirty seconds after the bite began, but allowed the bite to continue for another 25–30 seconds.

Allowing the dog to bite Bates's head for another forty seconds after she indicated her verbal surrender, and for a total period of approximately sixty seconds, is a serious intrusion, with the extent of its severity being a disputed question for the jury.[2]  This factor weighs against Rezentes's use of force.

### 2.    Government Interest

While the government certainly had a valid interest in using force to find and subdue Bates, a jury could reasonably conclude that this interest was significantly diminished after the initial bite and Bates's statement that she would come out from the bushes.  In assessing the government's interest, courts consider three primary but nonexclusive factors:  "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  And the Court must still examine all the circumstances surrounding the event, including the availability of less intrusive alternatives to the force employed.  *Rice v. Morehouse*, 989 F.3d 1112, 1122 (9th Cir. 2021).  The "most important" factor is whether the officer reasonably believed the suspect posed an imminent threat to the safety of the officer or others.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).

### a.    Severity of the Crimes

The severity of Bates's crimes is significant.  Bates was wanted, along with two others, for felony theft of over $10,000 in merchandise.  "The government has an undeniable legitimate interest in apprehending criminal suspects, and that interest is even stronger when the criminal is . . . suspected of a felony, which is by definition a crime deemed serious by the state." *Miller*, 340 F.3d at 964 (internal citation omitted).  Although there is a dispute about whether a reasonable officer would have known that his supervisor had retracted the claim that the women

---

[2] It is not necessary to reach the issue of whether the dog bite in this instance rose to the level of deadly force, as summary judgment would be denied even without such a finding.

assaulted the police by ramming their car into a police cruiser, it is undisputed that the driver collided with the police car while fleeing, which reflects dangerous conduct. This factor weighs in favor of Rezentes.

### b. Immediate Threat

A dispute of fact remains about whether Bates posed any danger to the officers or others. A reasonable jury could determine that Bates surrendered to the full extent of her abilities and posed no continued danger. Seconds into the bodycam footage, Bates shouts, "Please get your dog, I'm coming out." (BWC at 0:15–0:17.) When Rezentes then told her to crawl out, she replied, "But your dog's biting me!" (*Id.* at 0:17–0:25.) Throughout the remainder of the bite, she continued crying and screaming — for her mama, for help, for her brain. (*Id.* at 0:00–1:06.) And throughout the entire encounter, Ofc. Luo stood beside Rezentes with his gun drawn and aimed at Bates. (*Id.*) Viewing these facts in Bates's favor, a reasonable jury could infer that Bates was physically incapable of following Rezentes's commands while the dog was actively biting her head, and conclude that she posed no immediate threat to the officers or anyone else when she was surrounded and incapacitated.

Rezentes correctly notes that Bates cannot be seen through the shrubbery in the bodycam footage until the officers physically step into the bush, so he could not determine if she had a weapon. (*Id.* at 0:00–0:33.) However, a reasonable jury could interpret Rezentes's conduct as inconsistent with circumstances suggesting that Bates was likely to endanger officer safety. During the entire bite sequence, Ofc. Luo was providing lethal cover with his firearm drawn and pointed at Bates. At no point did either officer instruct Bates to show her hands, and they both walked into the bush without issuing that instruction. (*Id.* 0:00–1:03.) Moreover, just after Bates was bitten, Rezentes gave the release command ("pust"). (*Id.* at 0:00–0:03.) It is difficult to understand why Rezentes would do that, if the circumstances indicated that it would not be safe to call off the dog. The command was not successful, but Rezentes did not repeat it, and instead allowed the bite to continue for approximately sixty more seconds. Although Rezentes's subjective intent is not at issue, his behavior supports an inference that "the facts and

circumstances confronting" him did not pose an immediate threat.  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017).

Construing the evidence in the light most favorable to Bates, a reasonable jury could conclude that Bates posed no immediate threat because she was surrendered, unarmed, surrounded by officers, and physically incapacitated by the dog's continued hold on her head. This "most important" factor cuts against summary judgment.  *Mattos*, 661 F.3d at 441.

### c.  Evasion and Active Resistance

Third, and relatedly, it is a genuine question of material fact for the jury whether Bates was evading arrest for the duration of the dog bite.  Although it is true that she did not crawl out to Rezentes as he commanded, a reasonable juror could conclude that this was because she was physically unable to do so, not because she was attempting to resist arrest.

At most, the record shows that Bates was passively resistant.  Faced with similar passive resistance, the Ninth Circuit has found heightened force unjustified.  *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) ("[A] failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force."); *Rice*, 989 F.3d at 1127 (refusing command to exit a car, without swearing or threatening any of the officers, is passive resistance).  Drawing inferences in Bates's favor, a reasonable jury could conclude that she had stopped resisting entirely and that "the use of non-trivial force *of any kind* was unreasonable.'" *Id.* at 1126 (emphasis in original).  This factor weighs against Rezentes's use of force.

### d.  Less Intrusive Means for Effectuating Arrest and Surrounding Circumstances

Although "the government need not show in every case that it attempted less forceful means of apprehension before applying the force that is challenged," it is relevant to the excessive force analysis whether the officer could have used less forceful means.  *Miller*, 340 F.3d at 966.  Drawing inferences in Bates's favor, a jury could reasonably conclude that Rezentes could have called off his dog after Bates indicated her surrender without jeopardizing

officer safety or Bates's arrest.  The dog is trained to release its bite on Rezentes's command.[3]
(Rezentes Depo. at 66:17–67:1.)  As discussed above, just after Bates is bitten, Rezentes does
give the release command ("pust").  (*Id.* at 0:00–0:03.)  He says it a single time, while several
others are shouting nearby and Ofc. Luo provides lethal cover with his firearm drawn.  The dog
did not release the bite, but Rezentes does not repeat the initial command or state it more loudly.
Instead, he pulls on the dog's leash and waits.  Then, after Bates says that she is "coming out"
fifteen seconds later, Rezentes still does not command the dog to release.  (BWC at 0:15–1:00.)
Rather, he waits another forty seconds before finally ordering the dog again to release, manually
removing the dog, and moving forward with the arrest.  (*Id.* at 0:55–1:03.)  A reasonable jury
could conclude that Rezentes could have safely completed the arrest without requiring the dog to
continue to bite Bates after her verbal surrender, and that a reasonable officer would have
repeated the release command earlier.  This factor weighs against Rezentes's position.

> ### 3. Balancing

Overall, the record demonstrates that there are at least genuine questions of material fact
going to whether the duration of the dog bite amounted to excessive force.  The majority of the
*Graham* factors, including the most important factor, weigh against summary judgment.  It is
undisputed that Bates was unarmed and made no attempt to attack or flee after the dog bit her.  It
is also undisputed that another officer provided Rezentes with lethal cover throughout the entire
interaction.  The bodycam video shows that Rezentes initially gave the dog the release order a
few seconds after the bite, which a reasonable jury could find is inconsistent with an ongoing
concern for officer safety.  The video also shows that when the command was ineffective,
Rezentes did not repeat the order or say it more loudly, but instead allowed the dog to continue
to bite Bates, while she screamed and cried.  Disputes regarding whether Bates verbally
surrendered, whether a reasonable officer in Rezentes' position would understand that Bates was
physically incapacitated from complying with his orders, and the extent to which Rezentes could

---

[3] Rezentes does not argue that the dog is incapable of following the release command despite its
training, and there is no evidence supporting that conclusion in the record.

have responded with lesser force all create issues of fact that preclude summary judgment.

### D.   Qualified Immunity

Rezentes is not entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up).  To determine whether an officer is entitled to qualified immunity, a court must evaluate:  "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct."  *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1005 (9th Cir. 2017).  Although qualified immunity should generally be resolved at the earliest possible stage in litigation, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), summary judgment is inappropriate where the determination "ultimately depends on disputed factual issues," *Lopez*, 871 F.3d at 1021.

Because Bates has a viable excessive force claim, the qualified immunity inquiry turns on whether Rezentes "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mattos*, 661 F.3d at 440 (quoting *Pearson*, 555 U.S. at 231).  It has been "clearly established" in this Circuit for over twenty years that "excessive duration of a canine bite or improper encouragement of a continuation of an attack by officers could constitute excessive force that would be a constitutional violation."  *Hartsell v. Cnty. of San Diego*, 802 F. App'x 295, 296 (9th Cir. 2020) (cleaned up) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

Bates relies primarily on *Watkins* and *Hartsell* to show that the law was clearly established.  On the other hand, Rezentes supports his argument with cites to *Hernandez v. Town of Gilbert*, 989 F.3d 739, 742–47 (9th Cir. 2021), *Mendoza v. Block*, 27 F.3d 1357, 1358–63 (9th Cir. 1994), and *Miller*, 340 F.3d 959.  This case landscape is well-trodden and has recently been explained in detail elsewhere.  *See, e.g.*, *Rosenbaum v. Dunn*, 2022 WL 17491969, at *7–8 (N.D. Cal. Nov. 28, 2022); *Huipio v. City of San Jose*, 2023 WL 4409849, at *6–9 (N.D. Cal. July 7,

2023).

Of the cited cases, *Watkins* is the most instructive.  In *Watkins*, officers responded to a silent alarm at a commercial warehouse.  145 F.3d at 1090.  After giving two canine announcement warnings, the officers released a police dog into the warehouse.  *Id.*  The dog ran out of the officers' sight, found Watkins hiding in a car, and bit his foot.  *Id.*  Upon arriving at the scene, the officer ordered Watkins to show his hands.  *Id.*  Watkins, "who was recoiling from the dog's bite, failed to comply."  *Id.*  While the dog continued to hold its bite, the officer pulled Watkins out of the car and onto the ground, where he was "surrounded by police officers with their guns drawn."  *Id.*  Once Watkins complied with the order to show his hands, approximately ten-to-thirty seconds after the officer's initial order, the dog released its bite and the officers handcuffed Watkins.  *Id.*  The officer "justified his delay in calling off [the dog] because Watkins, while resisting the dog, failed to show his hands to prove that he was unarmed."  *Id.*  Watkins "explained that he did not show his hands because he was resisting the dog and recoiling from the pain of [the dog's] attack."  *Id.*  Watkins contended that the officer "continued to allow [the dog] to bite him even though he was obviously helpless and surrounded by police officers with their guns drawn."  *Id.*  The Ninth Circuit affirmed the district court's conclusion that the officer was not entitled to qualified immunity.  *Id.* at 1093.  The Ninth Circuit held that, regardless of whether the initial dog bite was justified, "it was clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation."  *Id.*

Here, Rezentes ordered Bates to crawl out of a bush and sit up — all while the dog actively bit her head as she lay on the ground.  It is undisputed that Bates said, "Please get your dog, I'm coming out," and that she responded to Rezentes's continued commands by crying out, "But your dog's biting me."  (BWC at 0:00–0:30.)  As in *Watkins*, a jury could conclude that a reasonable officer would have perceived from Bates's screams and cries at the outset that Bates was incapacitated by the dog bite and unable to comply with Rezentes's commands.  And, as in *Watkins*, it is undisputed that Rezentes had lethal cover throughout the full minute-long bite.

Furthermore, a reasonable jury could conclude that Rezentes could see from his vantage point that the dog was biting Bates's head about thirty seconds after the bite, and thus that he needed to intervene as soon as reasonably possible, rather than waiting another 25–30 seconds to attempt a further release command.  The bodycam video shows that, approximately thirty seconds after the bite, Rezentes was crouched immediately next to Bates and positioned his head near the ground to peer at her under the bushes, where she was lying with the dog next to her head.  Bates was crying about her "brain" at the time.  (BWC at 0:30–1:00.)

By contrast, the cases upon which Rezentes relies did not involve situations in which the bite continued for an excessive duration.  For example, in *Miller*, the deputy ordered the dog to release its bite (and the dog complied with this command) as soon as the deputy arrived on the scene — even though the suspect did not indicate their surrender.  340 F.3d at 961, 968.  The Ninth Circuit emphasized that if the officer had released the dog sooner, the suspect "might have had a chance to hide or flee anew, to recover a weapon, to harm the dog, or to prepare to launch an ambush against the deputes," reasonable concerns since the suspect was recently seen with a large knife and had hidden himself in the dark woods near his house.  *Id.* at 968.  Accordingly, the court held that it was not unlawful for the dog "to bite and hold Miller until deputies arrived on the scene less than a minute later."  *Id.*  Here, while there was limited visibility through the bush, the officers knew where Bates was located and had her under lethal cover.  And, unlike *Miller*, Rezentes did not successfully call off his dog after he located Bates.

Bates's case is also unlike *Hernandez*, where the suspect, who officers believed was armed, "did not surrender when warned many times that he would be bitten by a police dog after he failed to obey the officers' numerous orders to exit his car and resisted their use of lesser force to take him into custody."  989 F.3d at 744.  There, "the officers employed an escalating array of control techniques, none of which were effective in getting Hernandez to surrender, before deciding to release the police dog."  *Id.* at 745.  The suspect repeatedly refused to comply with each tactic:  verbal commands, control holds, pepper spray, and five canine release warnings.  *Id.* at 745–46.  After the dog bit Hernandez's arm, the officer yelled for Hernandez to exit the car.

*Id.* at 742.  Hernandez yelled, "Alright," but did not move.  *Id.*  The officer then commanded the dog to release its bite.  *Id.* at 743.  Fourteen seconds later, the dog complied and held onto Hernandez's shirt instead.  *Id.*  Hernandez still refused to leave the car, and instead held onto the front headrest and told officers that they were on his property.  *Id.*  After one-minute-and-twelve-seconds, the dog completely released from Hernandez.  *Id.*  It then took more time for the officers to drag Hernandez out of the car, even after the dog bite had ended.  *Id.* at 746.  Recognizing that "an officer cannot direct a police dog to continue biting a suspect who has fully surrendered and is under the officer's control," the *Hernandez* court found that the officer was entitled to qualified immunity "because Hernandez did not surrender at any point during the encounter; rather, the officers had to physically drag him from his car after the dog bite."  *Id.* at 745–46.  Although Hernandez argued that he had surrendered, this was "clearly contradicted by a video in the record," where his body language and actions made clear that he did not.  *Id.* at 746 (cleaned up).

Bates's physical incapacity is not analogous to Hernandez's prolonged, active resistance. Here, the video does not clearly contradict Bates's version of events:  a reasonable jury could find that her screams and wounds demonstrated her physical inability to comply with Rezentes's commands.  And still, in *Hernandez*, the officer did order the dog to release its bite when it appeared the plaintiff may have indicated some suggestion of verbal surrender.  Rezentes, by contrast, did not order his dog to release its bite after Bates stated her intent to leave the bush.

A reasonable officer would have known in 2020 that it violates the Fourth Amendment to prolong a dog bite after the suspect had done everything in their power to communicate surrender, and to give a physically incapacitated suspect repeated commands to sit up or crawl rather than calling off the dog.  As described above, the extent to which Rezentes could perceive that Bates was physically incapacitated, and that Bates had done everything possible to communicate her surrender, is a material dispute for the jury.  Moreover, a reasonable jury could find that Rezentes realized by thirty seconds into the bite, at the latest, that the dog was biting Bates's head, and that a reasonable officer would have acted promptly to call the dog off, rather

than wait another 25 to 30 seconds.  Overall, the record and governing law preclude a grant of qualified immunity to Rezentes as to the duration of the dog bite.

V.      **CONCLUSION**

Rezentes's Motion for Summary Judgment is **GRANTED** as to the initial canine deployment and **DENIED** as to the duration of the bite.  A case management conference is set for **May 29, 2024, at 10:00 a.m. via Zoom**.  The parties shall jointly file a case management statement, which shall address a proposed case schedule and the parties' views concerning referral to a magistrate judge for a settlement conference, by **May 22, 2024**.

**IT IS SO ORDERED.**

Dated: April 29, 2024

_____
RITA F. LIN
United States District Judge